James H. BROWN, Commissioner of Insurance for the State of Louisiana, Plaintiff,

v.

Norman F. SLENKER, et al., Defendants.

Civil Action No. 01–1521–A.

United States District Court, E.D. Virginia.

March 20, 2002.

James H. Rodio, Holland & Knight, L.L.P., McLean, VA, Eric J. Simonson, McGlinchey Stafford P.L.L.C., New Orleans, LA, Cassandra Annette Simms, Baton Rouge, LA, for plaintiff.

J. Jonathan Schraub, Paige Ashley Levy, Schraub & Company, Chtd., McLean, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is an unusual case that has traveled an unusual path to this district. It involves various claims growing out of an insurer's allegation that a lawyer and law firm retained to defend its insured physician in a medical malpractice case settled the claim for $700,000 without the knowledge or approval of the insurer. And, the case is here after (i) a jury trial in the Middle District of Louisiana, (ii) an appeal to the Fifth Circuit, (iii) a remand to the district court in Louisiana, (iv) followed finally by a transfer to this district. At issue now is whether the lawyer and law firm are entitled to summary judgment on the insurer's remaining claims of fraud and ·breach of fiduciary duty.

## I.

Plaintiff James H. Brown is the Louisiana Commissioner of Insurance (Commissioner), the successor in interest to the Physicians National Risk Retention Group (PNRRG), a risk retention group organized pursuant to Louisiana law. PNRRG insured medical doctors in many states. Defendants in this matter are Norman Slenker, an attorney and resident of Virginia, and his law firm, Slenker, Brandt, Jennings & Johnson (SBJJ).

This matter initially arose out of a medical malpractice claim brought in June 1990 by Karlissa Krombein in the Arlington Circuit Court against Dr. David K. Davoudlarian, a PNRRG insured. Under Davoudlarian's insurance policy, PNRRG was contractually obligated to defend him.

Accordingly, PNRRG retained Slenker and SBJJ to represent Davoudlarian in the *Krombein* matter. At the trial of the medical malpractice case, the jury returned a verdict in favor of plaintiff for $10,000, which the trial judge set aside on the ground that the damages awarded were insufficient. Accordingly, a retrial solely on the issue of damages was scheduled. Prior to this retrial, Krombein offered to settle for $500,000, the PNRRG policy limit, which offer Slenker rejected on Davoudlarian's behalf. Because PNRRG recognized that a retrial risked creating personal liability for Davoudlarian in the event damages were awarded in excess of the $500,00 policy limit, it agreed to pay any damages Davoudlarian might ultimately incur, up to the Virginia $1 million statutory cap on damages.[1]

In the retrial on damages, plaintiff received an award of $1.5 million, which the trial judge reduced to $1 million to comply with the statutory cap. PNRRG elected to appeal. To suspend execution of the $1 million judgment pending appeal,[2] PNRRG forwarded to Slenker at his home $1.175 million in a cashier's check payable to the clerk of the Arlington Circuit Court with instructions to Slenker to deposit the check with the Arlington Circuit Court. Slenker confirmed receipt of the money and deposited it in the court.[3] An appeal was then perfected in the Supreme Court of Virginia.

In November 1991, during the pendency of the appeal, a Louisiana state court declared PNRRG insolvent, issued an order of liquidation, and stayed all proceedings involving PNRRG. The liquidation order

---

**1.** When this cause of action arose, the statutory cap for a medical malpractice claim in Virginia was $1 million. *See* Va.Code § 8.01–581.15.

**2.** *See* Rule 5:24, Rules of the Supreme Court of Virginia.

**3.** PNRRG stated that it intended to substitute an appeal bond for the check, but this was never done.

appointed the Commissioner to handle PNRRG's estate and asset distribution. The Commissioner, in turn, hired Louisiana attorneys, including Ossie Brown and Rolfe McCollister, to coordinate the liquidation. In this regard, Brown sent Slenker and SBJJ a letter requesting assistance in having the Louisiana liquidation and stay orders domesticated in Virginia. No response was forthcoming from Slenker or SBJJ. And, while an SBJJ partner other than Slenker filed a motion to stay proceedings in another Virginia malpractice case involving a PNRRG insured, neither he nor any other member of SBJJ made such a motion in the *Krombein* case.

█ Brown then sent a letter to Slenker and all other attorneys representing PNRRG insureds setting forth the terms of their representation and requesting certain information. Specifically, this letter instructed SBJJ and other retained attorneys to retype the letter on their firm stationery, sign it, and return it to Brown, along with other additional requested information. Compliance with these instructions was necessary for Slenker and SBJJ to receive payment for fees and expenses incurred in representing Davoudlarian. The first sentence of the letter stated: "[b]y means of this letter, we wish to advise you that we will represent you in those matters pending in this jurisdiction in which Physicians National Risk Retention Group in liquidation has been made a party defendant."[4] When Slenker read the letter in April 1992, he wrote on the cover page that he did not understand what the letter referred to and that he never represented the Commissioner. Yet, he did not communicate this view to

the Commissioner. Instead, in a May 1992 letter to the Commissioner, Slenker noted that SBJJ "has for consideration a request ... that we sign a contract with you concerning representation" of physicians insured by PNRRG and then went on to complain that SBJJ had not been paid for its existing work on behalf of those physicians, despite repeated assurances to the contrary from Brown and others. Slenker expressed displeasure at the fact that SBJJ was now required to "sign the contract" in order to receive any payment. Slenker concluded that it would "enhance the prospects of a contractual relationship" if the Commissioner promptly paid all submitted invoices. Thus, Slenker could not recommend that SBJJ sign the letter.

Then in June 1992, the Supreme Court of Virginia reversed and remanded the medical malpractice case on all issues. This result rendered the appeal bond unnecessary. Krombein's counsel, Brian Shevlin, however, sent Slenker a letter expressing the belief that it was in both parties' interests to keep the bond in place. Slenker did not inform the Commissioner or his attorneys of that correspondence. At the time, the Commissioner and his attorneys were aware of the $1.175 million deposited in the Arlington Circuit Court, but took no steps to assert or protect any interest the Commissioner might have in the money.

On July 21, 1992, SBJJ returned the retyped letter to the Commissioner, signed by an SBJJ partner other than Slenker. In the letter, SBJJ agreed that all invoices and receipts had to be submitted monthly for approval by the Commissioner's office and by the Louisiana court in charge of

---

4. Unlike Louisiana, Virginia is not a direct action state; insurers are not parties to lawsuits filed against their insureds. *Compare Buchanan v. Doe,* 246 Va. 67, 431 S.E.2d 289, 291–97 (1993) and La.Rev.Stat. § 655(b).

Thus, despite the letter's assumption to the contrary, neither the Commissioner nor PNRRG was ever a party to a Virginia lawsuit against Davoudlarian defended by SBJJ.

the liquidation. The terms of the letter were retroactive to the date of the liquidation. The firm's cover letter noted that the "letter of intent" was "regarding our representation of certain Physicians National insureds." It added that SBJJ looked forward to immediate payment of its outstanding expenses and fees.

On October 15, 1992, Slenker discussed the $1.175 million bond with McCollister, who was in charge of coordinating the liquidation in states east of the Mississippi River. McCollister stated the Commissioner wanted the money returned to Louisiana. Slenker told McCollister that Davoudlarian would object to that, and that Davoudlarian wanted the case resolved. Slenker also informed McCollister that a new trial was set for May 1993 and that Krombein's settlement demand was now $800,000. Beyond this, the content of the conversation is disputed. Slenker claims he informed McCollister that he represented only Davoudlarian and that he could never participate in any effort to remove the money because such an effort would be contrary to his client's interest. By contrast, McCollister claims Slenker simply stated that he could not involve himself in a struggle between the interests of Davoudlarian and the Commissioner. According to McCollister, the conversation left him with the impression that Slenker would seek release of the appeal bond and report back to McCollister.

By November 5, 1992, attorneys Slenker and Shevlin had agreed to settle the *Krombein* lawsuit for $700,000. Slenker did not inform the Commissioner of this agreement nor seek the Commissioner's approval of it, even though Davoudlarian's insurance policy granted PNRRG the right to approve any litigation settlement. On November 5, Shevlin moved the Arlington

Circuit Court to release $700,000 of the $1.175 million on deposit to fund the settlement. Slenker did not join the motion, but noted that he was required to follow Davoudlarian's wishes and, thus, did not oppose the motion. At that time, Slenker never informed the Commissioner of the hearing, although he did inform the Arlington Circuit Court that PNRRG was in liquidation. The Arlington Circuit Court granted Shevlin's motion, entered an order releasing the $700,000, and the settlement was consummated.

It is alleged that Slenker never notified the Commissioner of the settlement, Krombein's motion, or the disposition of the appeal bond, until he sent the Commissioner a FedEx letter on November 24, 1992. This letter, it appears, was sent (i) nineteen days after the Arlington Circuit Court's ruling with respect to the release of the appeal bond, (ii) two days before Arlington Circuit Court lost jurisdiction over the matter,[5] and (iii) one day before the Thanksgiving holiday.

Two years later, in 1994, the Commissioner filed the instant lawsuit against Slenker and SBJJ in Louisiana state court. As later construed by the Fifth Circuit, the Commissioner's complaint claimed $700,000 in damages and alleged that Slenker's and SBJJ's conduct constituted:

(i) attorney malpractice;

(ii) breach of the fiduciary duty of loyalty defendants owed the Commissioner arising from the attorney-client relationship as a client;

(iii) breach of the fiduciary duty Slenker owed the Commissioner arising from receipt of the $1.175 million; and

---

5. *See* Va.Rules 1:1 (providing that a trial court retains jurisdiction over a matter until

twenty-one days after entry of a final judgment, order, or decree).

(iv) breach of contract, based on the July 21 letter, which allegedly created a contract in which defendants agreed to represent the Commissioner in the *Krombein* matter.[6]

Three years later, over defendants' objections, the Commissioner was allowed to amend his complaint to add claims of fraud and constructive fraud.[7]

Following the filing of the complaint in 1994, defendants removed the matter to the United States District Court for the Middle District of Louisiana (hereinafter "Louisiana district court") where they filed a motion to dismiss for lack of personal jurisdiction or, alternatively, to transfer the case to the Eastern District of Virginia. That motion was denied. At the close of discovery, defendants moved for summary judgment, claiming the Commissioner had not provided evidence sufficient to establish the elements of his claims. This motion was also denied, as was defendants' motion for summary judgment on the ground that the Commissioner's claims were untimely under Louisiana law. The Louisiana district court also determined that Virginia state law governed the matter and the case proceeded to trial by jury.

At the close of the Commissioner's case-in-chief, defendants moved for judgment as a matter of law under Rule 50(a), Fed. R.Civ.P., claiming that the Commissioner had not introduced evidence sufficient to establish: (i) personal jurisdiction over defendants; (ii) the existence of a duty owed by defendants to the Commissioner pertaining to the allegations in the complaint; (iii) proximate causation of damages; and (iv) that defendants should not prevail on their affirmative defense of contributory negligence. The motion was denied then and again at the conclusion of all the evidence. But the Louisiana district court did grant judgment as a matter of law on the Commissioner's counterclaim, awarding him the claimed $700,000 in damages.

■ Defendants then appealed to the Court of Appeals for the Fifth Circuit, which reversed and remanded each of the Commissioner's claims for retrial, holding, *inter alia:*

(i) that the trial court should have determined whether this action was time-barred under Louisiana prescription law;

(ii) that the malpractice claim and the claim of breach of fiduciary duty arising from the attorney-client relationship should be submitted to the jury;

(iii) that the breach of fiduciary duty claim independent of the attorney-client relationship should be submitted to the jury; [8]

---

**6.** See *Brown v. Slenker,* 220 F.3d 411, 416 (5th Cir.2000).

**7.** The Commissioner asserts that it was not until well into the discovery process that he discovered or should have known of facts sufficient to plead a claim of actual fraud or constructive fraud. Specifically, the Commissioner claims that only in discovery did he learn (i) that notes from Slenker's office reveal that Slenker advised staff members to postpone sending the FedEx package to the Commissioner's office, allegedly to ensure that PNRRG could not halt the settlement; and (ii) that Slenker retained the court reporter for the November 5, 1992 settlement hearing before the Arlington Circuit Court, indicating that Slenker had played a role in setting that hearing, contradicting his claim to the contrary.

**8.** It is clear that Virginia law does not bar a client from suing his attorney for a breach of fiduciary duty without regard to malpractice, provided there is a basis for the fiduciary duty outside of the attorney-client relationship. See *Weidman v. Babcock,* 241 Va. 40, 400 S.E.2d 164, 165–66 (1991).

(iv) that the breach of contract claim should be submitted to the jury.

*See Brown v. Slenker,* 220 F.3d 411, 426 (5th Cir.2000).

On remand, the Louisiana district court accepted the Commissioner's concession that the claims of breach of contract, legal malpractice, breach of fiduciary duty arising from the attorney-client relationship, and conversion were time-barred under the Louisiana prescription statute. *See Brown v. Slenker,* Civil Action No. 94–2725–A, at 7 (M.D.La. Sept. 25, 2001) (ruling on motions). The Louisiana district court also noted that ten years was the proper prescriptive period for the breach of fiduciary duty claim arising independently of the attorney-client relationship under Louisiana law.[9] *See id.* at 7–8; La. Civ.Code Art. 3499. Accordingly, the Louisiana district court concluded the breach of fiduciary duty claim was timely. *See id.* at 8. The Louisiana district court also noted that fraud claims under Louisiana law have a one-year prescriptive period, pursuant to La.Civ.Code 3492, but noted a jury must determine when the Commissioner knew, or should have known, of facts sufficient to allege a claim of fraud. *See id.* at 8–9. Finally, the Louisiana district court granted defendants' motion to transfer the remaining claims of fraud, constructive fraud, and breach of fiduciary duty to this district. *See id.* at 10–11. Defendants now seek summary judgment on the fraud and breach of fiduciary claims.

The parties argued the matter orally and the Court granted defendants' motion for summary judgment on the fraud claims, but not on the breach of fiduciary duty claim. *See Brown v. Slenker,* 197 F.Supp.2d 497, Civil Action No. 01–1521–A (E.D.Va. March 20, 2002) (order). This Memorandum Opinion sets forth the reasons for this ruling.

## II.

### A. Breach of fiduciary duty

 Defendants seek dismissal of the breach of fiduciary duty claim on various grounds, including timeliness. It is, however, unnecessary to address each ground individually. Rather, it is enough and dispositive here to note, as did the Fifth Circuit, that Virginia recognizes that a fiduciary duty independent of the attorney-client relationship can arise solely by virtue of defendants' receipt of the $1.175 million[10] and to note further that the Fifth Circuit ruled that this claim must be submitted to the jury. *See Brown,* 220 F.3d at 424, n. 14–15. Because these rulings are law of the case, they control here because a decision of a court of appeals must be followed in all subsequent proceedings in the same case in the trial court. *See United States v. Aramony,* 166 F.3d 655, 661 (4th Cir.1999).[11]

 Thus, only the timeliness of the breach of fiduciary claim remains to be considered. This issue was addressed by the Louisiana district court, but not by the

**9.** This claim will be referred to hereafter simply as the "breach of fiduciary duty" claim, as the fiduciary duty claim based on the attorney-client relationship was dismissed as time-barred and plays no further role in this litigation.

**10.** *See Brown,* 220 F.3d at 426 (citing *Weidman v. Babcock,* 400 S.E.2d at 165–66).

**11.** The three exceptions to the general law of the case rule that court of appeals rulings

must be followed by a district court in the same case arise where (i) subsequent proceedings produce substantially different evidence, (ii) controlling authority has since made a contrary decision of law applicable to the issue, or (iii) the prior decision was clearly erroneous and would work manifest injustice. *See Aramony,* 166 F.3d at 661. None of the exceptions applies here.

Fifth Circuit. The Louisiana district court determined that this claim has a ten-year limitations period and is therefore timely. *See Brown v. Slenker*, Civil Action No. 94–2725–A, at 7–8 (M.D.La. Sept. 25, 2001) (ruling on motions); La.Civ.Code. Art. 3499. This ruling is also law of the case, but is subject to reconsideration here because it issues from a district court, not a court of appeals. *See* 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4478 (1981) (hereinafter "Wright") (noting that under the doctrine of law of the case, one judge owes deference to the decisions of another judge in the same case, although this deference is not absolute).[12] The law of the case doctrine sensibly does not bar a district court from reconsidering its own rulings in a case, although this should only occur relatively infrequently. And where, as here, the previous district court ruling in a case was issued by a different district, the prior ruling is entitled to great deference and should not be revisited absent a compelling reason to do so. Here, the Louisiana district court's application of the ten-year limitations period to the claim of breach of fiduciary duty was appropriate under Louisiana law and, as such, there is no reason to revisit that determination. *See* La.Civ. Code Art. 3499. Thus, the breach of fidu-

ciary claim is timely and must be submitted to the jury.

**B. Fraud**

Defendants argue for the dismissal of the Commissioner's actual and constructive fraud claims, asserting that the proper elements were not adequately pled and that, in any event, the claims are time-barred. Only the latter issue requires discussion.

 The starting point in the analysis of this issue is to acknowledge that it was addressed and resolved by the Louisiana district court prior to the transfer to this district. Specifically, the Louisiana district court concluded that the limitations issue with respect to the fraud claims was for the jury to resolve because a factfinder was needed to determine when the Commissioner discovered, or should have discovered, the alleged fraud, and thus whether the claims are time-barred. *See Brown v. Slenker*, Civil Action No. 94–2725–A, at 8 (M.D.La. Sept. 25, 2001) (ruling on motions).[13] Although this ruling constitutes law of the case and is entitled to great deference, such deference does not prevent reconsideration of this issue where, as here, there is a compelling reason to do so. *See* Wright § 4478. This

---

**12.** *See also Brubaker v. Board of Educ., School Dist. 149*, 502 F.2d 973, 990 n. 5 (7th Cir. 1974); *Hertz v. Graham*, 292 F.2d 443, 446–47 (2d Cir.1961); *Dictograph Prods. Co v. Sonotone Corp.*, 230 F.2d 131, 134–36 (2d Cir.1956); *Bahamas Paper Co. v. Imperial Packaging Corp.*, 58 F.R.D. 355, 356 (D.C.N.Y. 1973); *GAF Corp. v. Circle Floor Co.*, 329 F.Supp. 823, 826–27 (D.C.N.Y.1971).

**13.** The Fifth Circuit, applying the rule of *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), referred to the conflicts of law rules of Louisiana to conclude (i) that Louisiana law governed with respect to the applicable prescriptive period and (ii) that Virginia law gov-

erned with respect to the substantive causes of action alleged. *See Brown*, 220 F.3d at 419–20. This determination is binding here because a transferee district court must apply the law that would have been applied had there been no change of venue. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

Further, it is undisputed that a one-year prescriptive period applies to a cause of action for fraud under Louisiana law. *See Brown v. Slenker*, Civil Action No. 94–2725–A, at 8 (M.D.La. Sept. 25, 2001) (ruling on motions) ("Tort claims for fraud … are governed by the one-year prescriptive period under [Louisiana] Civil Code article 3492.").

reason, simply put, is that the Commissioner was aware of facts in 1992 that would have supported the assertion then of a valid claim for actual or constructive fraud under Virginia law.

The essential question presented is whether the facts known to the Commissioner in November 1992, after he learned of the settlement, constitute a sufficient basis for alleging actual or constructive fraud under Virginia law. Specifically, the facts known to the Commissioner in 1992 were as follows:

(i) The Commissioner knew that the settlement, which had occurred without his knowledge or authorization, was funded with the $1.175 million provided to defendants for the appeal bond. The Commissioner also believed that defendants knew that the $1.175 million came from and belonged to the Commissioner, not the insured, and that the money was given to defendants for the *sole* authorized purpose of funding the appeal bond.[14]

(ii) Furthermore, use of the bond money to fund the settlement was not only without *notice* to the Commissioner and without his authorization, but it was also, as the Commissioner knew, contrary to his post-appeal instructions to defendants to take steps to secure release of the bond money from the Arlington Circuit Court and to return the money to the Commissioner.

(iii) It can be reasonably assumed that the Commissioner knew that the Arlington Circuit Court would not have released the bond money without the request or at least explicit approval or concurrence of defendants.

(iv) The Commissioner also knew that defendants then did not notify him of the settlement until the day prior to Thanksgiving, making it highly unlikely, if not impossible, for the Commissioner to take effective steps to object to the settlement before the Arlington Circuit Court lost jurisdiction over the matter.

(v) The Commissioner also knew that defendants' failure to provide him with notice of the settlement and to seek his authorization was material; the Commissioner knew that he would not have authorized the settlement.

(vi) The Commissioner also knew that defendants' actions with respect to the money were intentional, not accidental or inadvertent. This is so because when defendants notified the Commissioner in 1992 that the settlement had been effected without notice to him or his authorization, they made clear their belief that they had no obligation to give

**14.** The Fifth Circuit noted that the parties dispute the purpose of the $1.175 million check. *See Brown v. Slenker,* 220 F.3d at 415 n. 2. The Commissioner claims that PNRRG posted the money solely as an appeal bond, whereas defendants argue that the money was to be used to protect Davoudlarian from any form of liability in the *Krombein* matter. This dispute between the parties is not material to the question whether the Commissioner was aware of facts and circumstances in 1992 that supported the assertion of a fraud claim. This is so because what matters to the analysis of this question is what the record shows the Commissioner knew and reasonably believed in 1992. In this respect, there is no doubt that the Commissioner knew in 1992 that he had advised defendants that the sole purpose of the money was to fund the appeal bond. Put more generally, the point is that the facts needed to support the assertion of a claim need not be uncontroverted before the claim can be asserted.

him notice or to obtain his authorization to use the bond money to fund the settlement.

The next step in the analysis is to determine whether these facts, known to the Commissioner in 1992, would support a claim of actual or constructive fraud under Virginia law. Put somewhat differently, the inquiry is whether these facts, if pled in support of a claim for actual or constructive fraud, would state a claim under Virginia law and survive a threshold attack. If so, then the one-year prescriptive period appropriately commenced running in 1992, when the Commissioner learned of the facts surrounding the settlement. As such, a claim of fraud would be time-barred because more than one year elapsed from the time the Commissioner had knowledge of these facts until 1994, when the complaint was filed.[15]

The requirements for a Virginia fraud clam are well-settled and not controversial,[16] and it is clear that the facts known to the Commissioner in 1992 meet these requirements. Central to a Virginia fraud claim is the requirement for a misrepresentation of material fact,[17] and in this regard it is clear that concealment or failure to disclose a material fact consti-

tutes such a misrepresentation.[18] The failure of defendants to give the Commissioner notice of the settlement and to seek his authorization to use the bond money to fund the settlement clearly meets this requirement. Equally clear is the materiality of this omission; had the Commissioner received timely notice, he asserts he would have taken appropriate steps to object to the settlement and to prevent defendants from using the bond money to fund the settlement. Nor is there any doubt that the facts known to the Commissioner in 1992 would have allowed him to plead the reliance and damages required for a fraud claim. See Evaluation Research Corp., 439 S.E.2d at 390. Thus, the Commissioner knew in 1992 that he was relying on defendants to take steps to safeguard the bond money and to keep him advised of all material matters concerning the case. And, the Commissioner also knew in 1992 that defendants' failure to do this proximately caused the Commissioner to incur a $700,000 loss. In short, the Commissioner was unquestionably aware of facts in 1992 that would have enabled him to assert a valid claim for constructive fraud under Virginia law.

The sole remaining question is whether the facts known to the Commissioner in

15. Although the Commissioner's claims of actual and constructive fraud were not alleged until his 1997 amended complaint, they relate back to 1994, the date of the original filing of the complaint. See Rule 15, Fed.R.Civ.P.

16. Under Virginia law, the elements of fraud are: (i) a false representation or omission; (ii) of a material fact; (iii) made intentionally and knowingly; (iv) with intent to mislead; (v) reliance by the party misled; and (vi) resulting damage to the party misled. See Evaluation Research Corp. v. Alequin, 247 Va. 143, 439 S.E.2d 387, 390 (1994); Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 630 (4th Cir.1999). The elements of a cause of action for constructive fraud are the same except that the false representation of material fact need only be made innocently or negli-

gently, not intentionally and knowingly with an intent to mislead. See Evaluation Research Corp., 439 S.E.2d at 390.

In Virginia, concealment of a material fact or a failure to disclose may constitute the element of misrepresentation. See Beck v. Smith, 260 Va. 452, 538 S.E.2d 312, 315 (2000); Van Deusen v. Snead, 247 Va. 324, 441 S.E.2d 207, 209 (1994).

17. See Evaluation Research Corp. v. Alequin, 247 Va. 143, 439 S.E.2d 387, 390 (1994); Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 630 (4th Cir.1999).

18. See Beck v. Smith, 260 Va. 452, 538 S.E.2d 312, 315 (2000); Van Deusen v. Snead, 247 Va. 324, 441 S.E.2d 207, 209 (1994)

1992 would also have allowed him to allege the knowledge and intent to deceive required to state a claim for actual fraud. Here again, an affirmative answer is clear. The Commissioner knew in 1992 that defendants' silence on the settlement and the use of the bond money to fund it was deliberate, not inadvertent. Indeed, defendants admitted as much to the Commissioner when they advised him in 1992 that they neither notified him of the settlement, nor sought his authorization to use the bond money to fund it because they believed they had no obligation to do so. The Commissioner thus knew in 1992 that defendants' omission was knowing and intentional. He was also aware at the time of facts and circumstances that strongly invited, if not compelled, an inference of intent to deceive.[19] Thus, the Commissioner was in possession of ample facts in 1992 to plead and support a facially valid claim for actual and constructive fraud under Virginia law.

This conclusion is not affected by the fact that the Commissioner did not discover until 1997 (i) that Slenker attempted to delay sending the November 24, 1992 letter informing the Commissioner that the settlement had occurred and (ii) that Slenker had retained the court reporter for the November 5, 1992 settlement conference before the Arlington Circuit Court. While this information may well support the Commissioner's fraud claim, it does not follow that he was without sufficient information to plead fraud until he learned of these facts. Simply put, knowledge of this information was not a prerequisite to the Commissioner's assertion of the fraud claim. Instead, this information simply served to bolster a cause of action, the fundamentals of which were already known to the Commissioner in 1992. In these circumstances, it is settled that the

discovery of new facts supporting a cause of action does not affect the running of the limitations period. *See Maty v. Grasselli Chem. Co.*, 303 U.S. 197, 200–01, 58 S.Ct. 507, 82 L.Ed. 745 (1938); *Smith v. Piper Aircraft Corp.*, 18 F.R.D. 169, 174–75 (D.Pa.1955). Put colloquially, the additional facts discovered in 1997 during the discovery process provide nothing more than extra support for the Commissioner's time-barred fraud claims, like a fresh layer of icing spread on a cake long gone stale.

Thus, the Commissioner's fraud claims are time-barred because more than one year elapsed from the date of his knowledge of facts sufficient to support a fraud claim until the filing of his complaint in 1994. Accordingly, defendants' motion for summary judgment on the claims of actual and constructive fraud must be granted.

An appropriate order has issued.

---

**19.** *See* p. 505, item (iv) *supra.*